UNITED STATES DISTRICT COURT

DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 DEC 16 PM 1:54

STEPHAN HARRIS, CLERK
CHEYENNE

CHRISTOPHER JAMES WITHROW,

    PLAINTIFF,

    V.

MALLORY MIZELLE, MEGAN MIZELLE, NICK AND DEBORAH MIZELLE, SUED IN THEIR INDIVIDUAL CAPACITIES, AND KELLY ROURKE, PATRICK COGAN, (DBA BUILDING ARIZONA FAMILIES), SUED IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES, AND DOUG DUCEY, GOVERNOR OF ARIZONA, MARK BRNOVICH, ATTORNEY GENERAL OF ARIZONA, SUED IN THEIR OFFICIAL CAPACITIES.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

RE: (CASE NO. TO BE ASSIGNED)

16-CV-304 F

JURY TRIAL DEMANDED

---

## LAWSUIT / COMPLAINT
## PURSUANT 42 U.S.C. § 1983
## UNDER THE CIVIL RIGHTS ACT

---

This is a civil rights action filed by Christopher James Withrow for damages and injunctive relief under 42 U.S.C. § 1983, alleging parental kidnapping and violation of his Constitutional Rights.

(1)

Under the Fourteenth Amendment to the United States Constitution, parents have a protected liberty interest in the care, custody, and control of their children.  Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000).

**Jurisdiction:**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).  Plaintiff seeks redress for violations of his federal rights under U.S.C. § 1983.

**The Plaintiff Alleges:**

**Parties:**

1.  Plaintiff is a resident of the County of Sheridan, State of Wyoming.  The Plaintiff was incarcerated at the Scottsbluff, Nebraska Federal detention Center, Akron, Colorado Detention Center, and the Federal Correctional Institute in Littleton, Colorado during the events described in this complaint.

2.  The Defendant Doug Ducey is the Governor of the State of Arizona.  He is sued in his official capacity.

3.  The Defendant Mark Brnovich is the Attorney General of the State of Arizona.  He is sued in his official capacity.

4.  The Defendants Kelly Rourke and Patrick Cogan are the Social Worker and the Director of the Adoption Agency "Building Arizona Families".  They are both sued in their individual capacities as well as their official capacities within, and Doing Business As, Building Arizona Families.  Business Address is listed as 18355 West Ivy Lane, Surprise, Arizona 85388.

5.  Megan Mizelle is a resident of the County of Sheridan, State of Wyoming.  She was incarcerated at the Scottsbluff, Nebraska Federal Detention Center and the Federal Prison Camp in Phoenix, Arizona during the events described in this complaint. Address: 37900 N. 45th Ave. Phoenix, Arizona  85086

6.  Mallory Mizelle is a resident of Maricopa County, State of Arizona and resides at 17004 N. 45th St. Phoenix, Arizona 85008.

7.  Nick and Deborah Mizelle are husband and wife and are residents of Yellowstone County, State of Montana.  Address: 450 El Molino St. Billings, Montana  59101.

8.  The Governor and Attorney General of Arizona have acted, and continue to act, under color of the state law at all times relevant to this complaint.

**The Law:**

9.  42 U.S.C. § 1983 Civil Action For Deprivation of Rights
    Every person who, under color of any statute, ordinance, regulation custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any Citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, priveleges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

10. Pursuant 28 U.S.C. § 1331 the federal district courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States" (this is called federal question jurisdiction).

(3)

11. **28 U.S.C. § 1343 Civil Rights and Elective Franchise**

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by an act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowlege were about to occur and power to prevent;

(3) To redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege or immunity secured by the Constitutuon of the United States or by any act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights...

12. **28 U.S.C. § 1367 Supplemental Jurisdiction**

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have Supplemental jurisdiction over all other claims that

(4)

are so related to claims in the action within such
original jurisdiction that they form part of the same
case or controversy under Article III. of the United
States Constitution...

13. **28 U.S.C. § 1738A Parental Kidnapping Prevention Act:**
This Act of 1980 (PKPA) adopted by Congress establishes
standards regarding appropriate exercise of jurisdiction
over custody matters among states.
Under the PKPA, home state jurisdiction is paramount.
Due to the Supremacy Clause in Article VI of the United
States Constitutuon, when there is a conflict between the
PKPA and a state's Uniform Child Custody Jurisdiction
Enforcement Act (UCCJEA), the Parental Kidnapping Prevention
Act as federal law overrides the UCCJEA.

14. **Wyo. Stat. Ann. § 14-2-501 (b)(ii)**
The father-child relationship is established between a man
and a child by an effective acknowledgement of paternity by
the man under Article b of this act.

15. **Wyo. Stat. Ann. § 14-2-310(a)**
The petition for the termination of the parent-child
relationship shall be filed with the court by: parent;
or (ii)  the guardian or the "legal" custodian of the
child; or (iii) An authorized agency.
(vii) "Custodian" means a person responsible for the child's
child's welfare **"AND" HAVING LEGAL CUSTODY OF A CHILD
BY COURT ORDER.**

16. 2011 Arizona Revised Statutes Title 8 Children

§8-533 Petition for Termination; who may file; grounds

A. Any person that has a "legitimate" interest in the welfare of a child... may file a petition for the termination of the "parent-child relationship" alleging grounds contained in subsection B of this section.

B. (1) That the parent has abandoned the child.

(4) That the parent is deprived of civil liberties due to the conviction of a felony if the felony is of such a nature to prove that parent unfit to have future custody and control of the child. Example of such felonies include:

a) murder of another child of the parent;

b) manslaughter of another child of the parent; or

c) aiding or abetting or attempting, conspiring or soliciting to commit murder or manslaughter of another child of the parent, or if the sentence is so long that the child will be deprived of a normal home for a "period of years"

§13-1302 Custodial Interference; child born out of wedlock; defenses; classification

A. A person commits custodial interference if, knowing or having reason to know that the person has no legal right to do so, the person does one of the following:

   (2) Before the entry of a court order determining
       custodial rights, takes, entices or withholds
       any child from the other parent denying that
       parent access to any child.

E.  A violation of this section is:

   (1) A class 3 felony if commited by a person other
       than the parent.

**The Statutory Termination Grounds surrounding 8-533 (B)(4)**

All references refer to a child being in out-of-home placement
pursuant to a court order and being under court supervision.

**Pursuant § 8-533(B)(9)** when parent is unknown "before" seeking
termination there must be a diligence to identify the child's
parents and that those efforts be unsuccessful.

**Termination of Parental Rights in Arizona:** Understanding the
Legal Requirements Neccessary to Obtain Permanency for Dependent
Children:

Carolyn T. Morescki, Unit Chief Counsel

Office of the Attorney General, Protective Services Section:

A "dependent child" is a child who is "adjudicated" to be in
need of proper and effective parental care and control and who
has no parent or guardian...

**A.R.S. § 8-201(13) Dependency Overview**

The broad definition of a "dependent child" allows  for consider-
ation, by the court, of nearly any factor... including Abandonment.
Burden of Proof: Preponderance of the Evidence 55(c) Ariz. R.P.
Juv.Ct.

Court adjudicates the dependency and enters findings for each
parent and child and Orders Case Plan:

(7)

Remain with parent * Family Reunification

Guardianship * Severance / Adoption

**Permanency Hearing:**

Required by State Law to be held: Within first 6 months for children ages 0-3.

**Termination of Parental Rights:**

Petitioner must prove at least one statutory ground for termination by clear and convivcing evidence at trial which would also be affirmed by a Court of Appeals.

**Statutory Termination Grounds:**

Substance Abuse A.R.S. § 8-533(B)(3)

Parent is unable to discharge parental responsibilities because the parent has a history of chronic abuse of dangerous drugs... and there are reasonable grounds to believe that the parents condition will continue "for a prolonged indeterminate period" "Chronic" means long lasting.  A parent's failure to remedy their drug problem is evidence that the parent has not overcome his dependence on drugs.  ADES must provide the parent with rehabilitative services and parent must have time and opportunity to participate.

**Arizona Revised Statute 25-1001** This Chapter may be cited as the Uniform Child Custody Jurisdiction and Enforcement Act.

A.R.S. 25-1031 Initial Child Custody Jurisdiction

A. Except as otherwise provided in section 25-1034, a court of this state has jurisdiction to make an initial child custody determination ONLY if any of the following is true:

1. This state is the home-state of the child;

2. A court of another state does not have jurisdiction under paragraph 1... and both of the following are true:

   (a) The child and the child's parents, or the child and at least one parent... have a significant connection with this state other than mere physical presence.

   (b) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

4. A court of any other state would not have jurisdiction under any of the above criteria.

   C. Physical presence of or personal jurisdiction over a party or a child is not necessary or sufficient to make a child custody determination.

17. **Wyoming Law**

   **6-2-204 Interference with custody**

   (a) A person is guilty of interference with custody if she knowingly: (i) Takes a minor from the custody of of the minor's parent, guardian or other lawful custodian; or (ii) Fails or refuses to return a minor to the person entitled to custody.

18. **Individuals With Disibilities In Education Act (IDEA):** "A child's residence is the same as that of the child's parents."

19. **Elements of Kidnapping:** "every person who with an evil and unlawful intent takes a young child whether he resists or not falls within legislative purpose of forcibly stealing, taking or arrests any person.. is guilty of kidnapping.

## FACTS OF THE CASE:

20. In order to aid this court Withrow provides the following
    chronological order of events and brief history:

    Megan Mizelle is from Sheridan, Wyoming.  She went to High
    School in Sheridan, Wyoming.  Withrow is also from Sheridan,
    Wyoming and attended High School there.  Withrow's grand-
    father lived in Sheridan and was President of the Bank.
    Mizelle's father worked for the Railroad and they eventually
    moved up to Billings, Montana.

    Mizelle was abusing drugs and ended up the mother of 3 kids
    by two different men.  She ended up back with her parents
    when she lost custody of the three kids after one of the
    fathers sued for sole custody.

    Mizelle continued to abuse drugs with her sister Mallory,
    such as alcohol, atteral and methampetamines.  After a law
    enforcement involved assault on her mother Mizelle moved
    back to Sheridan and into a known drug stash house.

    In the summer of 2010 Mizelle met Withrow through a mutual
    friend.  She moved into Withrow's residence in Sheridan
    rather quickly.  She continued to use methamphetemine,
    atteral, and alcohol over the next few years untill the
    current charges were brought against her.

    In February of 2014 Withrow moved to Atlantic City away from
    Mizelle because he was finished with the whole drug scene
    and Mizelle refused to stop using.  He came back to see
    Mizelle on occasion and in this time span Mizelle ended

up pregnant.

After learning of the pregnancy Withrow did everything but turn Mizelle in to the authorities to get her to quit using drugs. He even went so far as to tell the nurse at the clinic, during an ultrasound, that Mizelle was using meth and would not stop.

Mizelle had several ultrsounds before and after her arrest. All of these ultrsounds convinced Mizelle and Withrow that the baby was a boy. Withrow asked Mizelle to marry him. She said yes and they made plans to marry and make there home back in Sheridan, Story, or maybe Thermopolis, Wyoming.

Both Withrow and Mizelle believed they would not be incarcerated for very long. Mizelle believed she would be released on her own recognasence to be able to give birth to their baby. She told Withrow that he had sole naming rights of their baby. She also agreed that if they had to do a couple of years in prison that Withrow's mother should be the legal guardian of the baby untill they were able to return home to Sheridan, Wyoming.

Withrow's mother did research and found an insurance company who would sell her a policy called "Advantage" which would cover the birth of their child. On Mizelle's say-so Mrs. Withrow purchased the policy from United Benefits Insurance; policy No. PUB9018468 in Mizelle's name. It should be noted that Mizelle's family would have nothing to do with the

Whole ordeal. Mizelle's mother is quoted as saying, "she got herself into this mess -- she can get herself out!"

Up until the end of September 2014 it was Withrow and his family who Mizelle relied on for emotional and financial support. This was because her family had essentially abandoned her.

While in jail awaiting the outcome of the federal charges Withrow's mother continued to support Megan Mizelle financially. Mizelle told Mrs. Withrow that she would be signing documents giving her guardianship over the baby. Mrs. Withrow accepted the responsibility in return cor-resspondence. Withrow and Mizelle continued to make plans for marriage and decided a name for their baby, Alexander James Withrow.

Mizelle's motion for release to Sheridan, Wyoming, where she would have stayed on the Withrow properties, was denied.

On September 25, 2014 Mizelle's ultrasound was more clear and revealed the baby was a girl. This news turned every plan Withrow and Mizelle had discussed upside down, unbeknownst to Withrow... or his family.

Behind Withrow's back, Mizelle's sister and the rest of Mizelle's family came out of the woodwork. Mallory Mizelle had spoken to her parents and demanded that because Megan Mizelle was going to have a girl she would take the baby and adopt her as her own.

During a phone call Mallory told Megan what the plans were. Mizelle called her parents who made demands that Megan hand over the baby girl to Mallory and that Mallory would adopt the baby.  This way Mizelle (Megan) could be imprisoned in Arizona where Mallory lived and be able to see the baby at visits.  Mizelle was to do this or be disinherited.

Megan Mizelle was being held at a Federal Detention Center in Nebraska when the baby was born.  She gave the hospital permission to allow Mallory Mizelle to take the baby from to hospital.  Mallory then took the baby across several state lines to the state of Arizona with Mizelle's authority.

Mizelle gave the baby a name that her Dad told her to give the baby.

Nobody sought nor recieved permission from Withrow to take his child from the hospital.  Nobody sought nor recieved permission from Withrow to take the child across state lines. Nobody sought nor recieved permission from Withrow for Mizelle's sister to take care of his child.  Nobody asked Withrow anything.  Suddenly it was as though Withrow never existed.

Nobody would talk to Withrow to give him an address or phone number where Mallory could be reached.  Being incarcerated made the investigating extremely difficult.

Once the Withrow's were able to locate Mallory Mizelle immediate requests were mailed and emailed inquiring as

(13)

to what was going on; asking how the baby was doing.
Checks were mailed as gifts and support for the baby.

But Mallory had already begun to continue her illegal
course of conduct.  As soon as she got the baby to
Arizona Mallory Mizelle hired an attorney to initiate
the adoption proceedings.  Within 90days the attorney
filed an action in an Arizona Court to terminate Withrow's
Fourteenth Amendment and God Given Parental Rights.  They
cited an unconstitutional Arizona law which states something
to the effect that all incarcerated parents can have their
parental rights removed.

Mallory Mizelle returned all checks and correspondence
with a note telling Withrow and his mother that if they
wanted to contact her to do so through her attorney.
Withrow was served the termination request on May 7, 2015
and has been battling the case without counsel ever since.
This battle has included trying to remove the case to the
federal court based on a federal question jurisdiction.

Without an attorney, and from prison, this battle has been
anything but easy.  The law states Withrow and Mizelle
were pregnant.  They made plans.  The plans were broke by
Mizelle when Withrow was not informed nor allowed to be
a part of the decisions Mizelle violated the law.  Mallory
Mizelle in effect kidnapped the baby.  Because Mizelle (Megan)
abandoned the baby and signed a consent for the adoption
Withrow is left to be the child's sole authority parent.

Mallory Mizelle kidnapped the baby.  She did not ask the
State to declare the child in need of assistance.  No
guardian documents have ever been signed giving Mallory
Mizelle any authority whatsoever over the child.  She is
nothing more that an aunt.  Withrow has signed and authorized
in a notarized document giving his Parents guardianship
over the minor child.

The state of Arizona has no jurisdiction to hear any matter
whatsoever reguarding parental rights nor placement of the
child. As all attached documents show; Withrow and Megan
Mizelle have been, at all times, relevant to these proceedings,
residents of Sheridan, Wyoming.  Just because the baby was
born in Nebraska while the nother was away from home does
not mean the baby is a resident of Nebraska.  Just because
Mallory Mizelle was able to successfully kidnap the baby
from the state of Nebraska, cross state lines and into Arizona
does not mean the baby suddenly became a resident of Arizona.
The baby had not even been abducted for 24 hours when Mallory
Mizelle called a lawyer who initiated the adoption process.
Just because Withrow nor his parents have not been able
to get the baby back to her state of residence, (Wyoming)
and Mallory Mizelle has successfully illegally held the
baby in Arizona for the past 21 months does not make the
baby residing in the state of Arizona.

Because Withrow and Megan Mizelle are residents of Wyoming
and even made plans of returning to Wyoming, after their
sentences are served, any child born to them, even if it
was Germany, is still a resident of Wyoming.

(15)

The law has been violated and Withrow's substantial Civil
Rights under the laws of Wyoming and the United States
Constitutuon have been denied.

The removal or retention of a child is wrongful when it
is in breach of rights of custody under the law of the state
in which the child was habitually resident immediately before
the removal or retention; and at the time of the removal
or retention those rights were actually exercised or would
have been so but for the removal or retention.  The right
of custody include rights relating to the care of the child
and, in particular, the right to determine the child's place
of residence.

Under the Parental Kidnapping Prevention Act, a states court's
child custody decree must be enforced by all other states.
The state issuing the decree must be located in the "Home
State" of the child which is the state that had been the
child's home state within six months before being absent
from such state because of her removal or retention by a
contestant living in another state.  Although the child
has been in the state of Arizona thd is present there now
that connection is discounted because the child was kidnapped
and physical presence of the child alone is not sufficient
or even necessary to evoke jurisdiction.

What is even more important to jurisdiction is the fact
that no custody actions have been undertaken in any other
state as of the date of Withrow's petition for sole custody.
As stated above, Mallory Mizelle kidnapped the baby and

took her across state lines.  She called an attorney so she could adopt the **"fraudulent gain"**.  That attorney filed, for Mallory Mizelle, an action in Arizona Court seeking to have a Court terminate Withrow's parental rights.  No custody decree has ever been sought and the only legal guardians for Gia Marie Withrow on the present day are Mr. and Mrs. David J. Withrow.  The State of Arizona Court has not been asked to grant a custody decree.  Absent custody Mallory Mizelle has no standing in any court to bring any claims on behalf of Withrow's daughter.  That is precisely the reason she chose to ask an Arizona Court to terminate Withrow's Parental rights as that resolves the lack of custody on her part.

For purposed of the Parental Kidnapping Prevention Act there is little doubt that time during which Plaintiff's baby daughter has been in Arizona as a result of having been wrongfully taken from Plaintiff would not affect statues of Wyoming as the child's home state of residence.

Private custody agreements are not included in the definition of "custody determination" and thus even if the Mizelle's custody agreement was mutual between the mother (Megan Mizelle) and her sister (Mallory Mizelle) there was no custody agreement made by order of the court nor was any agreement incorporated into an order of decree or stipulated to in open court. With no "custody", not even a guardianship, being established by a court of law Mallory Mizelle has no power or authority over Withrow's daughter.

21. In further support of Mallory Mizelle's evil intent a few
things should be noted.  Federal law states that even if
a father is absent and his parental rights are in question
he still maintains control over his child...until such
a time his rights are actually severed. Mallory Mizelle
has failed to communicate as evidenced above thereby taking
it upon herself to act as Judge and jury and effectively
severing Withrow's parental rights all on her own.

Because Mizelle lives in Arizona her efforts at severance
have been quite effective.  She then utilizes that success
in her court actions stating the best interests of the
child lie with her because the baby does not know her father,
paternal grandparents, siblings, cousins, aunts, uncles,
great aunts and great uncles (only on father's side of
the family).

The mother, Megan Mizelle, has 3 other children from previous
relationships.  Mallory Mizelle has never made an attempt
to intervene in the lives of those children.  Never sought
severance nor adoption proceedings.  Those children's father
now faces imprisonment.  Mallory Mizelle has not made one
single inquiry into the children's welfare or future home
placement.  Mallory Mizelle never makes any attempts to
show "maternal aunt" affection at Christmas or birthdays
or any other aspects of Megan Mizelle's other children.

(18)

Mallory Mizelle learned that Megan Mizelle was going to have a baby girl and she wanted a child of her own. Mallory Mizelle is not married nor has she ever been married. Never has she had a baby of her own. Mallory Mizelle, her parents, her counsel, Building Arizona Familys, and even the Judge in Arizona, have kidnapped, lied, committed perjury, and cheated the minor child and her father out of a loving natural bonding. But, the baby isn't two years old yet. The damage created can be rectified. Baby's adapt extremely quickly to new surroundings and people. Only if this travesty was to continue into the child's educational years would the adaption be more difficult. At trial these facts will become evident.

## DISCUSSION OF CLAIMS:

22. Liberally construed, Plaintiff's claims are brought pursuant to the Fourteenth Amendment. The Fourteenth Amendment protects parents' liberty interest in the "care, custody, and management of their children"

   Due Process states- "no state shall... deprive any person of a liberty interest without due process of law." U.S. Const. amend. XIV § 1.

   To state a claim for relief under § 1983 this Plaintiff alleges he has been deprived of this right under the Constitution.

23. The Hague Convention and the Parental Kidnapping Prevention
Act (PKPA) differ only in the sense that the first authority
impicates abductions of children internationally while the
PKPA governs interstate abductions.  Otherwise the precedent
each sets forth is interchangeable.

**The Hague Convention States:**

The removal or the retention of a child is to be considered
wrongful where - a) it is in breach of rights of custody
attributed to a person... under the law of the state in
which the child was habitually resident immediately before
the removal or retention; and

b) at the time of removal or retention those rights were
actually exercised, either jointly or alone, or would have
been so exercised but for the removal or retention.

24. In the instant case, both parents of the child in question
were residents of Wyoming.  It is well documented in the
numerous letters Plaintiff and Megan Mizelle , Mailed and
sent to each other, that their shared intent was to be
married and make Wyoming their home state. Caselaw states-
"In the case of a young child, the conduct, intentions,
and agreements of the parents during the time preceding
the abduction are important factors to be considered."
See Kanth v. Kanth, 232 F.3d 901. [published in full-text
format at 2000 U.S. App. Lexis 27383.  See also Feder v.
Evans-Feder, 63 F.3d 217, 223 stating that court would
focus on parents' actions and shared intentions where children
were little at time of alleged wrongful retention.

25. There has never been a settled intention to abandon Wyoming to make Arizona a newly acquired habitual residence. This is evidenced by the attached exhibits. (letters between Withrow and Mizelle). In fact Megan Mizelle will be back in Wyoming to a halfway house by the time this action is filed. She will then be made to serve her 3 years of supervised release in Wyoming. Plaintiff, too, will soon return to Wyoming. For purposes of this filing Megan Mizelle has formally abandoned the child by signing permission for her sister to adopt the baby.

26. The United States Congress has repeatedly made the following findings, declaration and recognition: "persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention. See Title 42 U.S.C. § 11601(a)(2)-(3) and Title 22 U.S.C. § 9001(a)(2).

27. In the State of Arizona the government makes it extremely easy for a criminal to travel to another state and abduct a child, return to Arizona and then act under the guise of "local parentis" to have a court of Arizona people legitimize the abduction.

28. Even though the mother (Megan Mizelle) and the father (Petitioner) resided in Wyoming and made all plans for the future centering on Wyoming as home... the Mizelles (Mallory, Nick and Deborah) made plans to kidnap the baby and keep the baby from her paternal family forever... Using Arizona law to enable their endeavor.

29. Declatory Relief is also being sought against the Govenor and Attorney General of the State of Arizona.  This dispute concerns the validity and enforceability of Arizona Revised Statute, Title 8 subsection 533(B)(4).

The statute's vagueness violates due process where "persons of common intelligence must necessarily guess at its meaning."  See Smith v. Goguen, 415 U.S. 566, 572 n.8, L.ed.2d 605.

The statute reads that "abandonment" of a child can be declared simply by having been convicted of a felony where the sentence is for a "number of years."

In order to resolve this comtroversy, plaintiff requests that, pursuant to 28 U.S.C.§ 2201, this court declare this subsection as violating the federal vagueness standard and is therefore unenforceable to the extent that it violates all citizens rights of due process.

A valid case or controversy exists sufficient for this court to declare the rights and remedies of the parties in that there will continue to be a substantial number of plaintiffs who will be subjected to a termination of parental rights based solely on being incarcerated for an indeterminate sentence.

The standard of certainty as to what exactly the law proscribes is particularly strict where the uncertainty inceed by the statute threatens to inhibit the exercise of constitutionally protected rights.  See Colautti v. Franklin, 439 U.S. 352, 357, 58 L.ed.2d 596, 99 S. Ct. 675 (1979).

"For a number of years."  What exactly is the "number"
the Arizona statute deems as "too long" wherein the
deprivation would be damaging?

Research of federal case law in the Ninth Circuit reveals
two cases where the courts have declared "number of
years" as being to vague;

In Hagstrand v. Colvin, 2013 U.S. Dist. Lexis 62429
the District Court in Portland, Oregon states, "some
time" is a vague reference that could mean, for example,
six months or four years."  "Again, "last number of
years" is vague and not necessarily inclusive..." In
Seattle First National Bank v. NLRB, 444 F.2d 30 the
Ninth Circuit Court of Appeals states:  "The basis in
the record is illusory.  Accumulating..."over a period
of years"  merely camouflages the facts... By  itself,
an aggregat[ion] for an "undetermined number of years"
is meaningless."  (emphasis added).

Another informative caselaw which is persuasive is Green
v. Astrue, 2007 U.S. Dist. Lexis 69423 S.D.N.Y. " There
is no reason for remand where the claim was merely that
she had seizures "for the past--well an undetermined
number of years"  wherein the time period mentioned
is insufficient to require either a reversal or remand.
In cases demonstrating extra ordinary circumstances
where irreparable harm can be shown is federal injunctive
relief against pending state prosecutions appropriate.
See Younger v. Harris, 401 U.S. 37, 27 L.ed.2d 669, 91
S. Ct. 746.

"When an act of the legislature comes into conflict with
the command of the United States Constitution or the
Constitution of the State of its enactment, there is
no question as to the outcome."

A statute apparently governing a dispute cannot be applied
by judges, consistently with their obligations under
the Supremacy Clause, when such an application of the
statute would conflict with the Constitution. Neither
Congress nor a State can validate a law that denies
God-given rights and those conferred by the Fourteenth
Amendment.

Although the Arizona Revised Statute 8-533 May be
constitutional on its face, applying subsection (B)(4)
"a number of years" to the facts of the parental rights
conflict would be unconstitutional where there is nothing
Withrow can do to defend against such vagueness. It
especially does not apply to Withrow's circumstances
where he has only 2 years to serve and had made previous
arrangements for his parents to be guardian of the baby
untill his release.

30. Lastly, on or about January 4, 2016, Patrick Logan and
Kelly Rourke, doing buisness as "Building Arizona Families"
conspired with all of the Mizelles to create a fictional
social study regarding the termination proceedings.
Multiple times throughout their "study" these two individuals
report falsehood after falsehood in order to prop up
Mallory Mizelle and portray Withrow as some sort of
drug lord who has used and sold drugs his entire life.

The "study" is not supported by any documentary evidence.
Cogan's report contains fabricated evidence, exaggerated
or misstated facts and excluded exculpatory evidence.
These "social workers" and the Mizelles worked together
to derail plaintiff and plaintiff's family efforts at
reunification.

### Relief Requested

Plaintiff requests that Mallory Mizelle be enjoined
from proceeding with an action which violates his
constitutional rights; the child, Gia M. Withrow be
returned to his custody, care, and control; the State
of Arizona be prohibited from enforcing a vague statute
which undoubtedly causes all citizens irreprable harm;
that Building Arizona Families cease its tortious conduct;
that the Mizelles be barred from futher conduct violating
his constitutional rights.

Plaintiff further requests compensation from the above
torts in the following manner:

In punative and compensatory damages: Building Arizona
Families, Kelly Rourke and Patrick Logan - $2,000,000.00
(Two million dollars);  Nick Mizelle - $1,000,000.00
(One million dollars);  Mallory Mizelle - $680,000.00
(Six Hundred Eighty Thousand dollars); Megan and Deborah
Mizelle - $250,000.00 (Two Hundred Fifty Thousand dollars),
individually and separately.  Declatory Relief by injunction
is requested from Arizona Govenor Doug Ducey and Arizona
Attorney General Mark Brnovich.

Dated: December 12, 2016

Under Penalty of Perjury
this document is--

Respectfully Submitted,

cc) File

Christopher J. Withrow
FCI-Englewood
9595 W. Quincy Ave.
Littleton, Colorado 80123
unrepresented / pro-se